W. Blake Simms (021595)
The Law Office of W. Blake Simms
700 E. Baseline Road, Building B
Tempe, Arizona 85283
Telephone: (602) 312-1130
Facsimile:  (480) 461-1730
E-mail: bsimms@wbsimmslaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| SUSAN L. BRALLIER,<br><br>                    Plaintiff,<br><br>        vs.<br><br>NEXTCARE, INC.<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Susan L. Brallier, by and through counsel undersigned, as and for his

claims of relief against Defendant, NextCare, Inc., alleges as follows:

1.  Plaintiff is an individual residing in Maricopa County, Arizona.

2.  Defendant is a foreign corporation that is conducting business in Arizona.

3.  Defendant has caused to occur in the State of Arizona events out of which
    the Complaint arises.

4.  This Court, under 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claim
    under 31 U.S.C. § 3739(h).

5.  Venue in this district and the Phoenix Division is, under 28 U.S.C. § 1391,
    proper, as the events complained of occurred in Maricopa County.

Doc. #564035 v.1

## GENERAL ALLEGATIONS

6. Dr. Brallier, in 1987, obtained from Des Moines University College of Osteopathic Medicine and Health Sciences, her medical degree.

7. She, from July 1, 1987, through June 30, 1988, performed at Phoenix General Hospital an internship in Internal Medicine and Surgery.

8. She practiced Family Medicine from July 1988 to July 1989 then entered a Pediatric residency at Phoenix Children's Hospital/ Maricopa Medical Center, which she completed July, 1992.

9. Dr. Brallier, on or about July 5, 2010, began working for NextCare.

10. She, prior to her start date, signed a two-year contract.

11. Her title was "Provider."

12. Dr. Brallier's home clinic was the NextCare facility located at 1701 E. Thomas, Suite 102 in Phoenix, AZ.

13. Her base rate of pay was $75 per hour.

14. She also received a shift differential of $15 per hour for the hours she worked past 10:00 pm and a Holiday stipend of $125.

15. Dr. Brallier, at the time she began with NextCare, had experience both in Pediatric medicine and Family medicine.

16. NextCare initially hired her specifically to provide services to pediatric patients.

17. She, however, shortly after she began working for NextCare, informed Jodi Shepardson, Office Manager for the Thomas Clinic at that time, that she

Doc. #564035 v.1

had experience as a Family Practitioner and was completely comfortable

providing care to adults as well as performing her contractual obligations to

see pediatric patients.

18. NextCare then encouraged her to provide medical services to adults as well

as children.

19. NextCare's electronic health records system (EHR) is called NextGen.

20. There is, within NexGen EHR, a screen called "Provider Px."

21. This screen is a centralized access for the providers to various areas of the

patients chart where the provider can order documentation and diagnostics,

treatments, procedures, and medications.

22. The NextGen system triggers standing orders based on the patient's chief

complaint.

23. A medical assistant enters into the system the patient's chief complaint

during the triage stage.

24. Based on the perceived chief complaint, the system generated standing

orders for various medications, tests, diagnostics, and/or procedures.

25. On patients who had standing orders, the provider was directed to the "Care

Path" screen before they could access the patients chart.

26. When the providers were automatically redirected to the "Care Path"

screen, the program directed the provider to either "accept" (i.e., sign their

name to orders being written by the NextGen software for billing purposes),

or "reject" these orders.

Doc. #564035 v.1

27. This was before the patient even saw ( had a history taken by the provider) or received an examination by the medical professional whom the company expected to sign off on the orders.

28. The NextCare's NextGen system also required the provider to explain why the provider rejected the computer-generated "standing orders."

29. NextCare, by programming these diagnostics, medications, treatments and procedures, which it expected the providers to accept, bills Medicare and Medicaid or private insurance for these services.

30. These "standing orders" generate additional revenue for NextCare.

31. The medical director for NextCare, in September, 2010 sent to providers an E-mail stating there would be changes to NextCare's  protocols for "Care Paths" and triage procedures.

32. He announced the company would introduce into the system numerous additional "care paths" (i.e., "standing orders").

33. He also mandated that these care paths were to be followed without exception.

34. The medical assistants would, in the interim, receive specific training on taking patient histories and suggesting "chief complaints."

35. Prior to this training the medical assistants could be highly specific and thorough about a patient's symptoms and could enter a specific "chief complaint" into the NextGen EHR system.

Doc. #564035 v.1

36. With these changes, NextGen restricted the number of chief complaints the medical assistants could enter in the system..

37. NextCare had reprogrammed NextGen's "chief complaint" categories.

38. They reprogrammed generalized "chief complaints" that did not previously have computer-generated standing orders, which had the effect of triggering the standing orders which used to be under more specific complaints.

39. NextCare, by the summer of 2011, had almost all chief complaints programmed to generate some sort of standing order on almost all patients being seen.

40. Dr. Brallier, after this E-mail, noticed a large increase in standing orders.

41. 80%-90% of the patients that presented now had care paths the company expected her to accept.

42. The overwhelming majority of the standing orders were for diagnostics, treatments, procedures or medications that only a provider who performed on the patient a history and physical examination could evaluate

43. The tests the system were predominately unnecessary, not indicated, or contraindicated.

44. For example, every patient who was triaged with the chief complaint of "back pain" had a urinalysis and analgesics ordered by the computer.

45. So "back pain" was programmed to insinuate a kidney problem.

46. Kidney disease can be easily elicited by history and exam, and further, if kidney disease was an issue, Motrin could be harmful to the patient.

47. Another example was when patients presented with a chief complaint of a "cough".

48. When a patient came to a NextCare facility who told the medical assistant in triage of this complaint, the NextGen system provided standing orders for breathing treatments, a chest x-ray, and pulmonary function tests.

49. Without evidence of lower pulmonary involvement by exam (like pneumonia), chest x-rays have no value, especially in pediatric patients.

50. There are specific indications for radiologic evaluation to prevent unnecessary exposure to radiation, and "cough," alone, is not one them.

51. Yet, the NextGen system generated orders for even small infants to receive a chest x-ray, if the perceived complaint by the parent's was "cough."

52. The breathing treatments (SVNs) programmed into the NextGen as standing orders, for the chief complaint of "cough" were also of no benefit, unless the patient was wheezing, which, again, is something only a provider could determine.

53. Yet the company expected the providers to "sign off" on these orders before the provider had seen and examined the patient.

54. The standing order for spirometry that was also triggered by the chief complaint of "cough" applies only to patients who can, on demand, blow out as hard and as fast as they can to determine the amount of obstruction of their lungs.

55. NextGen ordered this test on infants and children incapable of performing this test.

56. Another common illness NextGen for which the system generated unnecessary diagnostics was uncomplicated diarrhea.

57. Diarrhea is a common symptom of viral gastroenteritis.

58. Diarrhea lasting less than two week, without the presence of blood or mucus and without clinical signs of dehydration, requires no diagnostics.

59. The NextGen system recommended a complete blood count and chemistry panel on all patients with diarrhea.

60. These tests are of absolutely no benefit in establishing either the cause or treatment of a viral gastroenteritis. Viral gastroenteritis does not require antibiotics, only supportive care (fluids and sympotomatic relief.)

61. The NextGen system ordered these same tests on infants and children, even when it turned out the parent's complaint had been inaccurate.

62. Infants with "diarrhea" had standing orders for blood work, even if it turned out the stools were normal and the parents were inexperienced and just did not know what a normal infant stool looked like.

63. Further examples of the misuse of standing orders for billing are as follows.

64. When a patient presented with fever, NextGen would trigger a protocol for Tylenol or Motrin.

65. Fever was defined as over 100.

Doc. #564035 v.1

66. The system had no way of telling if the patient had received a dose within the recommended time frame.

67. This gave risk to overdose.

68. Further, protocols for treatments in pediatric patients advise only to provide antipyretics if the child is uncomfortable.

69. At some point, NextCare started programming the system to order blood work on pediatric patients with a temp over 102.

70. Blood work is completely unnecessary, unless a skilled medical provider determines a child is toxic, lethargic, dehydrated, or irritable and has no obvious source or explanation for the fever.

71. Further, these tests would be contraindicated at an urgent care facility as the child should be transferred to a tertiary care facility immediately for evaluation.

72. Also such tests, absent the above conditions, would be contraindicated (the risks outweigh the benefits) because of the unnecessary exposure to pain (infants and small children are extremely difficult to perform venipuncture on) and risk of infection or bleeding.

73. The overwhelming preponderance of medical evidence for the standing orders for pediatric patients in NextGen have no support in any of the pediatric medical institutions.

74. NextCare also programmed their EHR with computer generated standing orders for a reported complaint of a toothache.

75. This triggered NextGens computer protocol for a myocardial infarction ("MI")

76. Medicare and Medicaid had stopped paying for dental care, but patients showed up en masse at NextCare with dental problems.

77. NextGen programmed their system to treat any complaint that might be construed as a cardiac issue (arm pain, jaw pain, "toothache", etc) as a symptom of a possible myocardial infarction.

78. This triggered the standing orders for an MI, including (even in pediatric patients with a "toothache"), sublingual nitroglycerin, aspirin, O2, CXR, EKG, CBC and chemistry panel.

79. Aspirin is contraindicated in children and sublingual nitroglycerin could kill a small child.

80. NextCare, a few years ago, entered into an agreement with a lab company that manufactured a rapid diagnostic test for common respiratory illnesses called Diatherix.

81. NextCare, pursuant to this arrangement, programmed a standing order in NextGen to order this test on any patient who had a complaint that was arguably a symptom of a respiratory illness.

82. This applied to patients with runny noses, stuffy noses, cough, fever, wheezing, congestion, sinus pressure, headache, sneezing, i.e., any of the myriad of complaints that accompany a cold.

Doc. #564035 v.1

83. Management, through the medical director, informed the providers they must accept all care paths without exception as they were for the "safety" of the patient.

84. Dr. Brallier, as did other providers, had objections to these standing orders.

85. The diagnostics the computer ordered were predominately unnecessary and inconsequential to the patient's diagnosis and treatment.

86. Since respiratory illnesses are treated symptomatically, the Diatherix test results provided "information only."

87. Dr. Brallier believed, as did the other doctors, that this test, and most of the standing orders, was a way for NextCare to generate revenue.

88. NextCare shwredly determined which diagnostics Medicare, Medicaid, and private insurance would always reimburse, even if the diagnostics were unnecessary.

89. Dr. Brallier and the other physicians believed this constituted fraudulent billing practices.

90. Diagnostics the computer system generagted that generated revenue had little or nothing to do with the presenting complaint, diagnosis, and management of the patients.

91. Dr. Brallier had voiced this to other providers, who, in turn, also had issues with the standing orders.

Doc. #564035 v.1

92. Dr Brallier received instruction from Dr. Michaela Leighton during her training on NextGen that she needed to sign off on more than 95% of the standing order.

93. She was also knew NextCare carefully tracked the percentage of the standing orders providers accepted.

94. It was also later revealed that providers had been threatened with the security of their positions regarding signing off on the standing orders.

95. Providers who signed off on less than 95% of the standing orders were negatively weighed.

96. NextCare not only tracked the amount of revenue the providers generated but also the amount they failed to generate.

97. The company dissuaded providers from sending even seriously ill patients to the Emergency Room, kept track of how many patients a physician did send, and, again, negatively weighed these referrals.

98. NextCare also encouraged physicians to use "high risk" diagnoses that would require a patient to return for follow-up appointments, by limiting the kind of diagnostic codes it programmed into the system for the providers to use.

99. NextCare again tracked providers for the number of high risk diagnoses and follow-up appointments they made.

100.     NextCare tracked how much injectable medication providers ordered, the procedures they performed, and how many on-site diagnostics

(including bloodwork and radiology), as well as how much on-site

prescription medication they prescribed.

101.     NextCare tracked the providers for overriding the billing system and

"no-charging" a patient, even if nothing was or could have been done for

the patient at the NextCare clinic.

102.     The company had instructed staff and providers that all patients

receive an examination (for billing purposes), even if the patient was

clearly beyond the capabilities of the clinic and required emergency

medical care.

103.     Dr. Brallier herself, on several occasions, had to pick patients up off

the waiting room floor or the clinic's parking lot and call 911.

104.     Standing orders for bloodwork applied to numerous patients with a

wide spectrum of complaints including, diarrhea, abdominal pain, shortness

of breath, dizziness, vertigo, weakness, fatigue, chest pain, fevers,

vomiting, etc.

105.     In the majority of these complaints a CBC and chemistry panel

provide little, if any, useful information about the diagnosis and

management of the patient.

106.     Patients who had private insurance ( like BCBS or

UnitedHealthcare) could have bloodwork run at the on-site NextCare lab.

107.     However, if a patient was enrolled in Medicare, Medicaid or an

HMO, ("case-rate') the bloodwork could not be run in the NextCare

Doc. #564035 v.1

laboratory, but would have to be sent to an outside laboratory, and results would not be available for one to three days.

108.     NextCare could, however, bill Medicare, Medicaid and the HMOs for the phlebotomy charge and specimen handling charge.

109.     The company tracked the standing orders for bloodwork, including declining standing orders for bloodwork or overriding the system to run bloodwork from "case rate" patients at the NextCare lab (where NextCare would not receive payment) and again negatively weighed the physicians for declining or overriding.

110.     Providers could access their productivity reports through the NextGen system.

111.     They could also see how their productivity compared to other providers working for NextCare.

112.     Dave Hermann, a physician's assistant at the Thomas Clinic generated for NextCare much more revenue than ordinary providers.

113.     Mr. Hermann was well known for "shot gunning" patients he saw, i.e., ordering numerous tests because the provider either (1) does not know what is wrong with the patient and hope that some of the test results may help them with a diagnosis or (2) wants to cover themselves in case of a misdiagnosis.

114.     Mr. Hermann, as a matter of routine, accepted standing orders and additionally ordered or performed hundreds of unnecessary diagnostics and procedures on his patients.

115.     Dr. Brallier, in fall 2011, sent Robin Polsen, the manager of the Thomas Clinic at that time, an E-mail expressing her concerns about Mr. Hermann's clinical practices and the possibility that he was ordering unnecessary diagnostics.

116.     Dr. Brallier explained shot-gunning to Ms. Polsen and stated that Mr. Hermann was guilty of that practice.

117.     In keeping with his "shot-gunning" approach to patient care, Dr. Brallier also brought up the fact that Mr. Hermann was ordering advanced imaging (MRIs, CTs, USs) and advanced work ups for complicated serious illnesses far beyond the scope of his training and beyond what was appropriate for an NextCare urgent care clinic.

118.     Dr. Brallier consistently declined the numerous standing orders programmed into NextGen.

119.     This, of course, denied the company of extra revenues had she signed off on these unnecessary tests and procedures.

120.     NextCare, of course, carefully tracked this information.

121.     Dr. Brallier, on or about December 1, 2011 was ordered to have a meeting at the Thomas Clinic with Jodi Shepardson, who had recently been

Doc. #564035 v.1

assigned the position of East Valley Operations Manager, and Jeanette

Anderson, M.D., West Valley Medical Director.

122.    Ms. Shepardson and Dr. Anderson informed Dr. Brallier that

NextCare was terminating her employment prior to the end of her two year

contract.

## CLAIM FOR RELIEF

### (Retaliation-False Claims Act)

123. Plaintiff incorporates by reference all previous allegations.

124.    31 U.S.C. § 3730(h) states:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

125.    In order to prevail on a section 3730(h) claim, a plaintiff must

demonstrate that "(1) he engaged in 'protected conduct,' (i.e., acts done in

furtherance of an action under § 3730) and (2) that he was discriminated

against because of his 'protected conduct.'" *Hutchins v. Wilentz Goldman*

*& Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001).

126.    Actions constitute protected conduct under section 3730(h) "where

(1) the employee in good faith believes, and (2) a reasonable employee in

the same or similar circumstances might believe, that the employer is

Doc. #564035 v.1

possibly committing fraud against the government." *Moore v. California Institute of Technology*, 275 F.3d 838, 845 (9th Cir. 2002).

127.     An employee who prevails on an FCA whistleblower action is entitled to "reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3730(h).

128.     Plaintiff complained about the Defendant's excessive medical billing.

129.     Plaintiff also refused to participate in the excessive medical billing.

130.     Defendant terminated Plaintiff for complaining about and refusing to engage in excessive billing.

WHEREFORE, Plaintiff demands judgment on her First Claim for Relief against Defendants for:

      a.   Economic damages in an amount to be demonstrated at trial;

      b.   Liquidated damages;

      c.   Plaintiff's reasonable attorney's fees and costs,;

      d.   Compensatory damages

      e.   Pre-judgment and post-judgment interest; and

      f.   Such other relief as the Court deems appropriate.

Doc. #564035 v.1

## DEMAND FOR JURY TRIAL

Plaintiff also, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands a trial by jury in these proceedings.


DATED this 30th day of November, 2012.

LAW OFFICE OF W. Blake Simms


By /s/ W. Blake Simms
   W. Blake Simms
   700 E. Baseline Road, Building B

Attorney for Plaintiff

Doc. #564035 v.1